## Hines, Director General, etc. v. Harris, et al.

(Decided February 15, 1924.)

### Appeal from Jefferson Circuit Court (Common Pleas, Third Division).

1.  Carriers—Whether Delay Was Unreasonable and Unnecessary Held for Jury.—In an action for damages for delay in carriage of cattle, whether a delay was unnecessary and unreasonable or due to the negligence of the carrier held for the jury.
2.  Carriers—Finding as to Shrinkage in Cattle Held Flagrantly Against Evidence.—A finding that shrinkage of 34 pounds per head in cattle was due wholly to delay in shipping held flagrantly against the weight of the evidence.
3.  Carriers—Carrier Not Responsible for Shrinkage in Weight After Delivery.—Carrier guilty of delay in shipment of cattle was not responsible for further shrinkage after delivery, the cattle being held in stock pens until sold subsequent to delivery.
4.  Trial—Request Held to Make it Duty of Court to Submit Phase of Case to Jury.—In action against carrier for shrinkage in cattle in transit, an offered instruction by defendant to the effect that delay caused by the stop for watering and feeding the cattle could not be taken into consideration in establishing negligent delay in transportation, even if erroneous, made it the duty of the court to submit that phase of the case to the jury under a proper instruction.
5.  Carriers—Instruction Erroneous as Making Carrier Insurer of Prompt Shipment.—In an action for shrinkage in cattle in transit, an instruction that if the cattle, when delivered to defendant, were "in good physical and merchantable condition, and were delivered to the consignee . . . in damaged or unmerchantable condition, the law is for the plaintiffs on this item, and you should so find," unless the jury found that the "damaged or unmerchantable condition was due solely to the inherent nature and

propensities and vice of the animals themselves," held erroneous as making the carrier an insurer of prompt shipment.

6. Carriers—Not Insurers as to Prompt Transportation.—The liability of a carrier as an insurer is applicable only to a failure to deliver the shipment intact and uninjured as it was when received, and is not applicable to prompt transportation, and as applied to animate freight relates only to a physical injury or destruction or loss of any of them, but even this rule does not apply when the shipper accompanies the shipments.

7. Carriers—Duty as to Promptness in Shipment.—The only duty of a carrier as to promptness in making shipment is that of exercising ordinary care to transport it with promptness and to prevent unreasonable delay.

8. Trial—Erroneous Instruction Held Not Cured by Another.—An instruction erroneous as making carrier insurer of prompt shipment of live stock held not cured by an instruction authorizing recovery only for the difference between the market value of the cattle on date of arrival in the condition they were in and the condition they would have been in had they arrived in due time, and for an extra shrinkage at that time as a result of the unreasonable delay.

GROVER G. SALES, and BRUCE, BULLITT & GORDON for appellant.

THOMAS C. MAPOTHER for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On September 20, 1918, appellees (plaintiffs below), L. R. Harris and others, delivered to the Nashville, Chattanooga & St. Louis Railroad Company at Pikeville, Tennessee, for shipment to themselves at Louisville, Kentucky, care Bourbon Stock Yards, six cars loaded with cattle and containing in all 155 head, whose average weight was 1,081 pounds. The total distance from Pikeville to Louisville was about 366½ miles and *en route* there were two junction points, one at Bridgeport, Tenn., 52 miles from Pikeville and the other at Nashville, Tenn., 127 mile from Bridgeport. The usual time for making the through trip, under ordinary circumstances and conditions, was, according to the proof, between 28 and 33 hours; but, excluding a stop at Bowling Green, Ky., for feeding and watering the cattle, the time consumed in this shipment was between 38 and 40 hours, and there was a delay of about 12 or 13 hours at Bowling Green although the federal statute providing stops for the purpose requires a minimum one of not less than five hours.

The cattle did not arrive in Louisville until Sunday night, September 22, about ten o'clock, and were not unloaded at the stock yards till about one hour thereafter, when they were put into the pens and fed and watered. They were not offered for sale on the market of Monday, the next day, because, as plaintiffs claim, they were in a gaunt, wan and somewhat depleted condition, so as to reduce their market value and, according to their judgmen, it was best to hold them over till another market later in the week so as to restore what they claimed should be their marketable condition. But, in the meantime, the market continued to decline and the cattle were sold in lots on different succeeding days up to and including Friday, and it is claimed that plaintiffs did not realize the market price which they could have done on Monday had the cattle been in a saleable condition on that day.

This action was originally filed by plaintiffs against the Nashville, Chattanooga and St. Louis Railway Company and the Director General of Railroads seeking a judgment against defendants for $812.05 because of the nonmarketable condition of the cattle on Monday, September 23, which the proof shows was the best market day of the week; for $625.30 extra loss in weight, and $177.00 for extra feeding due to the delay in shipment. An amended petition eliminated the railroad corporation as a defendant and confined the prosecution of the action against the director general only. The answer was a denial of all the allegations in the petition with an affirmative paragraph averring that the loss sustained by plaintiffs, if any, was due to their overcrowding the cars in which the cattle were loaded, or to weather conditions or from the inherent nature and propensities of the animals themselves. The reply denied the averments of that paragraph of the answer, and upon trial there was a verdict and judgment in favor of plaintiffs for all of the amount sued for except $48.00 as a part of the extra feed bills, which the court in its instructions disallowed, and complaining of that judgment the director general prosecutes this appeal, complaining chiefly of the instructions of the court, and that the amounts of the items recovered are not sustained by the evidence and are flagrantly against it.

The cattle were driven into Pikeville at about seven o'clock a. m. on the day of shipment, and remained in the stock pens at that place till something like two o'clock p. m. when they were loaded into the cars and left that point for Bridgeport later in the afternoon. They took the first train from the latter point to Nashville and made the trip at the rate of 12 or 15 miles per hour. Considerable delay was had at Nashville and it became evident that before the cattle could reach Louisville, 36 hours would expire within which under the federal statute and under the shipping contract, they must be unloaded for feeding and watering. The evidence shows that at that point they were amply fed and watered in well provided quarters for the purpose, and that they were all in good condition at that time and nothing transpired there to in any wise injure them. They remained in the stock pens and barns at that place for, as we have said, something like 12 or 13 hours, when they were carried with reasonable promptness to Louisville and unloaded in the stock pens at about eleven o'clock p. m. on Sunday evening. The proof shows that aside from the delays at junction points and at Bowling Green, there were also delays from the excessively crowded condition of the traffic at that time, a considerable portion of which consisted of troop trains and others carrying war material for the prosecution of the war in which the government was then engaged, and that it was the imperative duty of the railroad company, handling the freight at that time, to give way for all such traffic, and that north bound trains, in the direction of which the particular shipments of cattle were being moved, had to surrender to south bound trains under a necessary regulatory rule of the carrier. But whether the proven total delay, which was between 20 and 24 hours in excess of the usual time required, was unnecessary and unreasonable, or due to the negligence of the carrier, was a question for the jury under all the circumstances and conditions existing and encountered at the time, and the case was, therefore, a submittable one under proper instructions.

It was proven by plaintiffs that before the cattle were removed from the farm they weighed 169,245 pounds and that their total sales weight on the respective days upon which they were sold, extending, as we have

said, as late as Friday following their arrival, amounted
to 162,410 pounds, or a difference of 6,835; and it was
claimed in the petition, and the jury found, that all of
that amount, except 1,550 pounds, was due to the excess
delay in shipment and also, as alleged in the petition, to
improper handling *en route*, but, as we have said, there
was no evidence or circumstances as to the cattle being
injured, so as to indicate any negligence in the latter
respect. It was also alleged, and the jury found, that the
difference in the marketable value of the cattle, and rep-
resenting the difference between their condition on Mon-
day morning after having arrived the evening before,
and their condition on the same morning if they had ar-
rived within a reasonable time, was at least fifty cents per
hundred, which made up the item sued for of $625.30. It
will be observed that it was alleged and the jury found
that the normal shrinkage per head would be about ten
pounds, and that the actual shrinkage between the weights
at the farm and at the time of the respective sales was
about 44 pounds per head, or 34 pounds extra shrinkage,
on account of the negligent delay in shipment, and under
all the proof heard we are forced to the conclusion that
such an estimate or finding was flagrantly against the
weight of the evidence. Practically all of the witnesses,
including some of the plaintiffs themselves, testified that
the cattle, between the time they left the farm until they
left Pikeville, would undergo a normal shrinkage of at
least ten pounds per head and some of the witnesses
placed it at least twice that high. And likewise, the great
preponderance of the evidence was to the effect that a
normal shrinkage of from 25 to 50 pounds per head for
such a shipment is not unusual when it was made with
promptness. It will also be observed that the selling
weights of the cattle were taken on the respective days
they were sold, and from their aggregate the total loss
sued for and recovered was obtained. It was not shown
whether the cattle lost in weight by being held over in
the stock pens from the market on Monday till the days
upon which they were sold. If they did sustain any loss
by such holding over, defendant, as we shall hereafter
see, would not be responsible for it, since the liability
on this item would be measured by the difference in extra
loss of weight on Monday, after the cattle had arrived,

over and above what the normal loss would have been on the same day had the cattle arrived in due time.

Moreover, an instruction was offered by defendant to the effect that the delay caused by the stop for watering and feeding the cattle at Bowling Green could not be taken into consideration in establishing negligent delay in transportation, and without stopping to determine whether that instruction was technically correct, it became the duty of the court after it was offered to submit that phase of the case to the jury under a proper one. In combatting that contention plaintiffs' counsel urge that the delay at Bowling Green was rendered necessary through defendant's negligence in not arriving at Bowling Green sooner and in time to complete the trip within the 36 hours, which, as an abstract proposition, is true, but the error in it lies in the fact that counsel assumes negligent delay before arriving at Bowling Green. Such an instruction should be given but it should be predicated on the fact that there was no unreasonable delay before reaching Bowling Green, for if there was none then it was the duty of the defendant, under the federal statute, to unload the cattle for feeding and watering.

Again, the court in instruction number 1, given to the jury, said that if the cattle, when delivered to defendant, were "in good physical and merchantable condition, and were delivered to the consignee at the Bourbon Stock Yards in Louisville, Ky., in damaged or unmerchantable condition, the law is for the plaintiffs on this item, and you should so find," unless the jury found that the "damaged or unmerchantable condition was due solely to the inherent nature and propensities and vice of the animals themselves," in which latter event the verdict should be for the defendant. That instruction, according to our interpretation, does not embody the law as applicable to the proven facts. It makes the carrier an insurer as to prompt transportation when, under the law, the liability of the carrier as an insurer is applicable only to a failure to deliver the shipment intact and uninjured as it was when received. In other words, it applies to a total or *pro tanto* destruction or loss of the freight in the form of injuries arising from rough handling, and as applied to animate freight (live stock) to a physical injury to them or destruction to the lives or loss of any of them. But the rule in that case does

not apply when the shipper accompanies the shipments. When he does not do so the carrier has the absolute possession and control of the property without an opportunity on the part of the shipper or any one interested in its transportation to look after and protect it, and as a consequence the high liability is imposed by the law upon the carrier. L. & N. v. Taylor, 181 Ky. 794, and cases and authorities therein referred to. But that case and L. & N. v. Crain, 189 Ky. 431, and others referred to in them, clearly point out that such an absolute liability has no application to mere *delays* in shipment, since the only duty of the carrier, as to promptness in making the shipment is that of exercising ordinary care to transport it with promptness and to prevent unreasonable delay. Crain case, *supra;* Illinois Central R. R. Co. v. Holt, 29 Ky. L. R. 135, and 10 Corpus Juris 284. In the last reference, on page 283, section 404, the text says: "A carrier is not an insurer against delay in the transportation of goods. . . . And the rule applies to shipments of live stock as well as to other classes of property or goods shipped," and to that text the Holt case, *supra,* is cited in the note, as well as many others from other jurisdictions. In 4 R. C. L. 956, in treating of the measure of responsibility of a carrier of live stock for delay in shipment, the text says: "The doctrine that when a common carrier undertakes to convey goods the law implies a contract that they shall be carried and delivered at the place of destination safely and within a reasonable time applies to live stock as well as other property. Hence a carrier of live stock is liable for all damage that is referable to the negligent prolongation of the transportation through its natural effect on the physical condition or latent vicious propensities of the animals, whereby they are reduced in strength or weight more than they would have been had prompt carriage and delivery been made, or injure each other in consequence of viciousness, aroused by the excess of their confinement beyond the time necessary for transportation and delivery."

It will be seen that the delay for which the carrier is responsible is a "negligent prolongation of the transportation," which is by no means the assumption of the high duty of an insurer, and in view of the law measuring the duties of the carrier in such cases we are forced to the conclusion that instruction number 1, as we inter-

pret it, was erroneous. But it is insisted that, even so, the error was corrected in another instruction containing the measure of damages. That instruction authorized a recovery only for the difference between the market value of the cattle on Monday following their arrival in the condition they were in and the condition they would have been in had they arrived in due time, and for an extra shrinkage at that time as a result of the unreasonable delay; but it did not remove the high measure of responsibility of the carrier for producing such conditions, and for that reason we can not attribute to the other instruction the curative effect insisted on by counsel for plaintiffs.

Upon the whole case, we are convinced that a new trial should be granted, and the judgment is reversed with directions to sustain the motion and for proceedings consistent with this opinion.